**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

DONALD LEWIS and ROXANN LEWIS,                                        PLAINTIFFS
individually and as parents of Child Doe


v.                                          No. 4:13CV00212 JLH


CLARKSVILLE SCHOOL DISTRICT                                            DEFENDANT

**OPINION AND ORDER**

Donald and Roxann Lewis, individually and as the parents of Child Doe, bring this action against Clarksville School District, seeking the reversal of a due process hearing decision in favor of the school district along with costs and attorney's fees. The plaintiffs filed an administrative complaint against the school district, the Arkansas School for the Deaf (ASD), and the Arkansas Department of Education[1] (ADE) on October 10, 2011, alleging that the Child Doe had been denied a free appropriate public education (FAPE) during school years 2009-2010; 2010-2011; and 2011-2012. A hearing was held under the authority of the ADE pursuant to the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. § 1415. The hearing officer found that there was insufficient evidence to show the school district denied a FAPE to Child Doe. Document #1 at 78. The plaintiffs filed their complaint in this court on April 10, 2013. Document #1. Resolution of the matter with a bench trial or evidentiary hearing has been postponed multiple times. The plaintiffs eventually moved without objection to submit the case on the stipulated record and deposition testimony. Document #70. The Court granted the motion and permitted the parties to submit supplemental briefs and testimony of witnesses who would have testified at a hearing by evidentiary deposition. Document #71. For the following reasons, this Court finds that Clarksville School

---

[1] The Court dismissed the plaintiffs' claims against ASD and the ADE on October 9, 2013.

District complied with its obligation under federal law to provide Child Doe a FAPE in accordance with the IDEA.

## I.

The IDEA requires all local educational agencies receiving federal funds to implement policies "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." *B.S. ex rel. K.S. v. Anoka Hennepin Public Schools*, 799 F.3d 1217, 1219 (8th Cir. 2015) (quoting 20 U.S.C. § 1415(a)). A party challenging whether a FAPE has been provided has the right to file an administrative complaint and receive an impartial due process hearing before a local or state agency. 20 U.S.C. § 1415(b)(6). It also provides that a party who is aggrieved by the findings and decision made in a due-process hearing and who has no further administrative appeal has the right to seek review of that decision in federal district court without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2)(A) and (3)(A).

In actions brought under the IDEA, a district court serves a quasi-appellate function while remaining a court of original jurisdiction. *See Kirkpatrick v. Lenoir Cnty Bd. of Educ.*, 216 F.3d 380, 387 (4th Cir. 2000) ("[W]hile a federal district court may review a state review officer's decision and even defer to that decision, the federal district court does not sit as an appellate court. Federal district courts are courts of limited, original jurisdiction with no power to sit as appellate tribunals over state court or administrative proceedings."); *Spiegler v. D.C.*, 866 F.2d 461, 465-66 (D.C. Cir. 1989) (holding that the quasi-appellate role of the district court in an action brought under the [IDEA] does not differ in important ways from an administrative appeal for purposes of borrowing an appropriate statute of limitations); *Adler by Adler v. Educ. Dep't of State of N.Y.*, 760 F.2d 454, 458-59 (2d Cir. 1985) (same). The Eighth Circuit has explained the nature of a district

court's role in reviewing a claim brought under the Individuals with Disabilities Education Act as follows:

> The district court must . . . review the administrative record, hear additional evidence if requested, and "basing its decision on the preponderance of the evidence, . . . grant such relief as [it] determines is appropriate." *Id.* at § 1415(i)(2)(C). In deciding whether the IDEA has been violated, the district court must "independently determine whether the child [in question] has received a [free appropriate public education]." *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003), *cert. denied*, 540 U.S. 984, 124 S. Ct. 478, 157 L. Ed. 2d 375 (2003). In doing so, the court must also give "'due weight' to agency decision-making." *Id.* (quoting *Independent Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996)). This somewhat "unusual" standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law. *Dist. No. 283*, 88 F.3d at 561. But we have recognized that this limited grant of deference—"due weight"—is appropriate in IDEA cases because the ALJ "had an opportunity to observe the demeanor of the witnesses and because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s]." *CJN*, 323 F.3d at 636 (internal quotation marks and citation omitted).

*K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011) (first and fifth alterations added).

### III.

Doe was born on July 20, 1999 and, on that day, he failed a hearing screening.[2] Ex. Vol. VIII CSD at N-8. At four months old, an auditory evoked response test performed at Arkansas Children's Hospital indicated a severe to profound hearing loss in both ears, so medical professionals fitted Doe with over-the-ear hearing aids. *Id.* Doe was further evaluated on February 7, 2000, while attending pre-school at the Forrester-David Development Center in Clarksville, and as a result, he was determined eligible for early intervention services. *Id.* at N-2-N-4. He received day habilitation and speech therapy, and the Lewises received information from ASD on hearing loss, associated

---

[2] The Court has followed the timeline laid out by the school district in Document #65, while supplementing certain pertinent facts.

technology, and how to develop his communication skills. *Id*. at N-17. A speech pathologist reevaluated Doe on January 10 and 18, 2001 in preparation for his annual review from Forrester-David Development Center. *Id*. She found that Doe's language skills were approximately six months below his chronological age of 17 months and that his comprehension skills were delayed. *Id*. at N-58. She also noted that Doe still had difficulty tolerating his hearing aid. *Id*. at N-55. The annual review conducted on January 30, 2001, determined Doe was eligible to continue day habilitation and speech therapy, and added occupational therapy services. *Id*. at N-59, N-63.

On July 20 and 24, 2002, Doe completed another speech-language evaluation in preparation for his transition from the development center to the Western Arkansas Education Service Cooperative's three to five-year-old program. Ex. Vol. IV CSD at C-103. The speech pathologist noted that Doe had been without his hearing aids for almost two months prior to the evaluation and had been at the development center without his hearing aids fifty days in the past calendar year. *Id*. Doe did not receive therapy on days he did not have his hearing aids. *Id*. The speech pathologist found that Doe had made little progress in the past year and that it should be determined whether another communication method–such as sign language–may be more appropriate for him. *Id*. at C-105. She also recommended that the level of parental capability for at-home training in auditory skills and sign language be determined. *Id*. The Lewises indicated at a meeting on August 1, 2002 that they were not ready to use sign language at home and that they wanted the speech pathologist to use a cued-language system.[3] Ex. Vol. VIII CSD at N-154.

---

[3] Cued speech is different from sign language because it is a tool for the deaf or hard-of-hearing to better understand spoken languages, while sign language is its own complete language. Learning Language, Centers for Disease Control and Prevention (Feb. 18, 2015), http://cdc.gov/ncbddd/hearingloss/language.html.

4

Several months later on January 21, 2003–while Doe was still at the development center–the Lewises met with the director of the center and other employees to discuss a solution to Doe wetting his pants at school and to address Doe's communication plan. *Id*. at N-147. Roxann indicated at the conference that the speech pathologist wanted to train the family in cued speech before she began to use the system with Doe. *Id*. The Lewises agreed to work together with the speech pathologist to help Doe integrate into the classroom. *Id*. School officials met with the Lewises again a little over a month later to address the fact that speech therapy was unsuccessful, despite the parental involvement implemented in the previous meeting. *Id*. at N-145. Other options were discussed–such as therapy at Arkansas Children's Hospital or the Ramey Speech Clinic in Fort Smith–but the Lewises rejected those options due to gasoline costs. *Id*. at N-146. The Lewises attributed the lack of progress partly to the center's failure to require Doe to wear hearing aids. *Id*.

On February 19, 2003–when Doe was three years and seven months old–he underwent another assessment at Arkansas Children's Hospital. Ex. Vol. IV CSD at C-95. The speech-pathologist performing the assessment noted that Doe's parents had been counseled extensively on their role in communication development and that they appeared to understand all the information presented to them. *Id*. at C-96. She recommended that Doe be enrolled in an intensive therapy program for a trial period of three to six months so he could rapidly develop verbal language skills but that if he did not develop those skills, a change in communication methodology might be necessary. *Id*. at C-97. At the administrative hearing, Doe's former occupational therapist–who provided services for nine years beginning in April 2003–testified that Doe had been kicked out of two preschools. Hearing Transcript Vol. XII at 6-7. She also testified that Doe had no signing ability when she began working with him. *Id*. at 8.

The next documented evaluations of Doe's hearing took place in February and March of 2004, when Doe was four years old. Ex. Vol. IV CSD at C-92. He had left the Forrester-David Development Center by that time and was referred to Miracle of Speech Rehab. Inc. for evaluation by the Western Arkansas Educational Service Cooperative. *Id*. Doe was participating in occupational therapy, receiving counseling, and his family was receiving services from ASD. *Id*. He was enrolled at Community Development Inc. with an aide and scheduled to receive extended school year services for four weeks during the summer session. *Id*. The records from Doe's time at CDI were destroyed. Hearing Transcript Vol. XXII at 138. But Doe's occupational therapist testified that she worked with him that summer to help him communicate clearly, rather than grunting and pointing. Hearing Transcript Vol. XII at 102-103.

Doe started kindergarten at Pyron Elementary School in August 2004. Ex. Vol. IV at B-1. In September of that year, the Clarksville School District conducted a psycho-educational reevaluation in accordance with state and federal guidelines. *Id*. at C-85. The examiner conducted a variety of tests, concluding that the ultimate determination of the existence of a disabling condition was the evaluation committee's responsibility. *Id*. at C-89. The committee created an individualized education program (IEP) for Doe on October 19, 2004. Ex. Vol. V CSD at G-66. The program dictated that Doe would receive ninety minutes a week of speech therapy and sixty minutes of occupational therapy, and that he would spent 150 minutes a week in special education. *Id* at G-51. The program also implemented a variety of modifications, supplemental aids, and supports in the classroom, including reduced assignments, extra time for completing assignments, extra time for oral communication response, and some assignments conducted in a one-on-one setting. *Id*. at G-62. An educational consultant attended the meeting. *Id*. at G-66.

An annual review of Doe's first year in kindergarten was conducted on May 20, 2005. *Id.* at F-90. The review form indicates that Doe made progress but that he was being retained in the kindergarten. *Id.* He was able to sign two-word, conceptually accurate utterances to describe objects and state action in pictures. *Id.* He also was able to recognize sign and letter pairs–except for "K"–count to seven, and knew his colors. *Id.* The committee recommended that Doe have a sign language interpreter with him at all times during the school day. *Id.* It also determined that he benefitted from structural intervention and that extended year services for speech and occupational therapy with sign language would continue his progress. *Id.* at F-92. The committee prepared another IEP, which included 100 minutes of speech therapy each week, sixty minutes of occupational therapy each week, and 160 minutes of special education each week. *Id.* at G-39. The program implemented modifications, supplemental aids, and supports in the classroom similar to his IEP for the first year in kindergarten. *Id.* at G-46. An educational consultant attended the meeting. *Id.* at G-50.

On May 12, 2006, an annual review was conducted of Doe's second year in kindergarten. Ex. Vol. V CSD at F-70. Doe was able to sign the alphabet, write the alphabet, count and write numbers one through ten, and write his first and last name. *Id.* He continued to have difficulty communicating remote events, understanding and following requests, answering questions, providing opposites, demonstrating active-listening skills, and using age-appropriate vocabulary. *Id.* Doe met six of twelve of his speech objectives set out in his most recent IEP. *Id.* The committee determined that Doe was again eligible for extended year services for speech and occupational therapy with sign language instruction. *Id.* The annual review also indicates that a counselor with Arkansas Rehabilitative Services provided Roxann with information about a summer camp for children with hearing impairments. *Id.* The committee prepared Doe's IEP for the first

grade, which increased speech therapy to 150 minutes a week and special education services to 210 minutes a week, and provided Doe a full-time sign-language interpreter. *Id*. at G-29. The plan dictated that Doe would continue to participate in sixty minutes of occupational therapy a week and again implemented instructional modifications, supplemental aids, and supports. *Id*. at G-29, G-34.

At the end of the first grade, on May 10, 2007, the committee conducted another annual review of Doe's progress. *Id*. at F-54. Doe began to read in the first grade and met three of the six speech objectives from his most recent IEP. *Id*. The committee recorded that Doe would continue to need speech therapy for receptive and expressive language. *Id*. Because Doe made progress on his IEP, the committee determined that extended year services were not necessary. *Id*. Occupational therapy recommended those services but Roxann chose not to participate. *Id*. The committee developed an IEP for the second grade that provided the same amount of time each week of speech therapy, occupational therapy, and special education, and again provided instructional modifications, supplemental aids, and supports. *Id*. at G-20, G-25. The IEP continued the provision of a full-time sign-language interpreter. *Id*. at G-20.

In the fall of Doe's second-grade year on November 9, 2007, educators and administrators held a separate programming conference at Roxann's request to consider Doe's placement at ASD. Ex. Vol. IV CSD at E-15. The attendees discussed transportation to and from ASD, communication skills, behavioral issues at ASD, and academics. *Id*. The committee decided that Doe would transfer to ASD on Monday, November 26, 2007. *Id*. The school pledged to help Doe with the transition and to provide ASD with his IEP. *Id*. But the record from another separate programming conference held on November 30, 2007, indicates that Doe did not transfer to ASD, as previously planned. *Id*. at E-9. The Lewises, however, were aware that ASD was an option for the future, if they decided they wanted Doe to attend. *Id*.

The record also reflects that school employees noticed bugs on Doe's desk and in his ears during his second-grade year. Ex. Vol. VI CSD at L-2-7. On October 19, 2007, Doe's interpreter took him to the nurse's office because he complained of a bug in his ear. *Id.* at L-3. The nurse examined Doe's right ear and found a small bug coming out of the right ear canal. *Id.* at L-2. She also found what appeared to be a dead bug inside the right ear canal and found dried debris in the left ear canal. *Id.* Donald came to the school to take Doe home and indicated to Doe's interpreter that he needed to spray their home for pests. *Id.* at L-4. On November 5, 2007, school employees communicated with one another regarding a roach crawling across Doe's desk and his representation that they were in his shoes at home over the weekend. *Id.* at L-5. On November 22, 2007, Doe's interpreter took him to the nurse to have his ears checked, and she reported that the ears looked as if they had been cleaned. *Id.* at L-6. But two days later, Doe pulled what appeared to be the shell of a small bug from his ear while returning to the classroom from the nurse's office with his interpreter. *Id.*

In February 2008, a counselor from Community Service, Inc. met with Doe and his teachers for several weeks. *Id.* at L-9. She reported that Doe did not exhibit any conditions requiring regular mental health services and that individual counseling was not necessary. *Id.* Doe's annual review for the second grade took place on May 8, 2008. Ex. Vol. V CSD at F-34. He mastered none of the second grade reading skills but two out of five were emerging, he mastered one of ten writing skills but five out of ten were emerging, he mastered all of the oral or visual communication skills, and he mastered five out of 25 math skills with eighteen emerging. *Id.* Doe's teacher reported that the Lewises needed to support his learned skills from school in the home and make sure that he got enough sleep each night. *Id.* Roxann asked about a possible behavior plan at the meeting and the assistant principal indicated she would speak with the principal about a plan. *Id.* The committee

determined that Doe did not need extended year services. *Id.* The IEP developed for the third grade–2008-09–provided sixty minutes each week of occupational therapy, 150 minutes each week of speech therapy, and 210 minutes each week of special education. *Id.* at G-7.

School officials, the Lewises, an attorney, and a juvenile officer developed a behavior-modification plan during Doe's third-grade year. *Id.* at G-17-19. The record from the meeting states that the juvenile officer was present as part of a coordinated effort between the Lewises and the school to keep Doe out of the court system due to his misbehavior. *Id.* at G-17. The juvenile officer was directed to contact a juvenile case-worker in order to arrange counseling for Doe and his family. *Id.* Handwritten notes on the form show that on May 8, 2009, the plan was extended into Doe's fourth-grade year. *Id.* Behavior records from Doe's third-grade year demonstrate an increased pattern of insubordination. Ex. Vol. VI CSD at I-22-26. The principal testified that school officials used a mixture of the general disciplinary policy and Doe's specialized plan but that Doe still received the same discipline other students received. Hearing Transcript Vol. XV at 160.

On March 17, 2009, the assistant principal learned that Doe stole a teacher's wedding ring. *Id.* at K-2. The school resource officer transported Doe to the police station and contacted the Lewises. *Id.* The police department turned Doe over to the custody of the Lewises and school officials, but the school resource officer requested that a Family in Need of Services (FINS) petition be filed regarding Doe. *Id.* He stated that during the course of the school year, Doe had stolen a variety of items and thrown rocks at fellow students during recess. *Id.* The officer indicated that the school had implemented a number of interventions and was seeking court assistance. *Id.* The assistant principal referred Doe to Day Spring Behavioral Health Services for counseling shortly after the wedding ring incident. Ex. Vol. VI CSD at L-12. Day Spring replied that it had no openings and required a court order from the juvenile officer to get him in. *Id.* at L-11.

The Deputy Prosecuting Attorney of Johnson County filed a petition on April 13, 2009 asking the court to adjudicate Doe as a member of a family in need of services as defined by Ark. Code Ann. § 9-27-303(18). *Id.* at K-3. The juvenile court held a hearing on May 12 and filed an order the next day adjudicating Doe as a member of a family in need of services. *Id.* at K-5. The court placed Doe on court supervision for twelve months, ordered Doe and his family to participate in individual and family counseling, ordered the Lewises to make reasonable efforts to learn sign language, and ordered Doe to participate in the summer program at Day Spring. *Id.* at K-5-6. The Court also ordered Doe and the Lewises to cooperate with the juvenile office to facilitate a plan for his fourth-grade year–2009-2010–including taking a tour of the ASD campus and the Clarksville Public Schools Alternative Learning Environment classroom (ALE). *Id.* at K-6.

After the deputy prosecutor filed a FINS petition but before the hearing, the usual participants developed Doe's IEP for his fourth-grade year. Ex. Vol. 1 Parent Binder at 49. His speech and occupational therapy services and special education remained the same. *Id.* Roxann signed a parental agreement placing Doe in an ALE classroom. Ex. Vol. VI CSD at L-31. The ALE class included individual and group therapy each week for students–like Doe–who were Day Springs clients. Ex. Vol. XXII Hearing Transcript at 28-29. A staff member from Day Springs was present in the classroom each day. *Id.* Doe also retained the full-time services of his sign-language interpreter. *Id.* at 30. A Day Springs therapist testified that Doe made progress in social skills, behavioral skills, and academics during his time in the ALE classroom. *Id.* at 32, 35. Doe's teacher recorded that he missed seven days due to suspension or being held out by parents when school-related issues arose. Ex. Vol. IV CSD at C-25. Roxann testified at the due process hearing that she spoke with school officials after Doe stole the wedding ring and discussed a potential transfer to ASD, but was "dead set against it." Hearing Transcript Vol. XV at 103-05.

The juvenile court reviewed the FINS order on August 11, 2009, stating that all orders would remain in place. Ex. Vol. VI CSD at K-7. On September 16, 2009, Doe brought a pocket knife to school. *Id.* at K-11. The assistant principal drafted a letter to juvenile officers on that day, stating her issues of concern. *Id.* at K-9. She stated that Doe brought a pocket knife to school and lied to the principal about it, he was referred to the office for misbehavior in class, his legs were covered in insect or parasite bites which distracted him, he was out of compliance with Day Springs counseling services, and he was out of compliance with the provision of proof of hearing screenings to the school nurse. *Id.* Around this time, the principal brought in a behavioral consultant, who offered suggestions for managing Doe's behavior. Hearing Transcript Vol. XV at 143. On September 29, 2009, the school nurse–a mandatory reporter–filed a suspected child abuse report when Doe's interpreter found two live bugs inside his hearing aids. Ex. Vol. VI CSD at J-95-97.

The juvenile court conducted a FINS review hearing on November 24, 2009. *Id.* at K-18. Doe appeared in person and was represented by counsel. *Id.* The court found that Doe continued to be a member of a family in need of services as defined by Arkansas law. *Id.* The court ordered Doe to attend ASD and for the Lewises to comply with the school and enroll Doe. *Id.* The principal testified at the administrative hearing that the juvenile judge asked him about ASD during the review hearing. Hearing Transcript Vol. XV at 201  He told the judge that it was an option the school would like to try. *Id.* The CSD special education supervisor testified at the administrative hearing that when she heard the juvenile court had ordered Doe to enroll in ASD, she called the ADE compliance officer to ask if the court could do that. Hearing Transcript Vol. XXII at 134. The compliance officer responded that the juvenile judge could order the parents to enroll Doe in the ASD but could not order the school to do send him. *Id.* at 135.

12

A speech pathologist evaluated Doe on November 20, 2009 as part of his three-year comprehensive revaluation, as required by law. Ex. Vol. IV CSD at C-61. She rated Doe's articulation and language skills as "severe," indicating a need for special education services. *Id*. at C-66.

Doe's attorney, the prosecuting attorney, and the judge signed an agreed order on February 23, 2010 stating that Doe was enrolled in ASD, that he was ordered to follow all rules and conditions of the school policies, and that the parents would follow all conditions and policies. Ex. Vol. VI CSD at K-20. While Doe was attending ASD, the CSD special education supervisor attended some meetings, provided financial assistance to Doe's mother so that she could travel to meetings, and provided a behavioral consultant. Hearing Transcript Vol. XXII at 135-36.

## IV.

Though Doe's background provides context for the Lewises' allegations, the relevant time period for this Court's determination is limited by the statute of limitations. The IDEA states:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

20 U.S.C. § 1415(f)(3)(C). The ADE procedural requirements on hearings state:

> The due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the due process complaint.

Ark. Admin. Code 005.18.10-10.01.3.2 (West 2015). The Lewises requested a due process hearing on October 10, 2011. Document #1 at 4, ¶9. Therefore, only actions taken by the school district between October 10, 2009 and October 10, 2011 may form the basis of the Lewises' due process complaint. During this time period, Doe was enrolled in Clarksville Public Schools from the first

13

day of the statutory period through February 9, 2010. Ex. Vol. VII ASD at 54-63. The court-ordered transfer of Doe from the Clarksville School District to the Arkansas School for the Deaf occurred during this time period and is the alleged action at issue.

The Lewises contend that "the District specifically devised a method of changing Child Doe's placement from the District to the Arkansas School for the Deaf through the Johnson County Juvenile Court by filing a FINS Petition." Document #64 at 35. According to the Lewises, Doe's transfer to ASD was without due process, constituting a denial of a FAPE and a failure to select the least restrictive learning environment. *Id*. at 31. They rely on *Springdale School District #50 of Washington County v. Grace*, an Eighth Circuit opinion where the court held that the Education for All Handicapped Children Act–currently enacted as the IDEA–does not require the state to provide the child with the best possible education. Document #79 at 62-3 (citing 693 F.2d 41, 43 (8th Cir. 1982)). An IEP was developed for the child–Sherry–stating that ASD was the proper school to meet her needs. *Id*. Her parents challenged that portion of the IEP in a due process hearing and a hearing officer found that the school district could offer her a FAPE by providing her a certified teacher of the deaf, rather than sending her to ASD. *Id*. A district court affirmed the hearing officer's decision and the school district appealed, arguing that it was unreasonable for it to bear the cost of establishing a program for Sherry when ASD already had one and when ASD officials were more equipped to handle the needs of handicapped children. *Id*. The Eighth Circuit stated:

> Although the School for the Deaf may offer the best education opportunities for Sherry, the Supreme Court has made it clear that the Act does not require states to make available the *best* possible option . . . The cost to the school or the judgment of local authorities do not justify the intervention of this Court to place Sherry elsewhere when the mainstreaming provisions of the Act and the judgment of the state's administrative decisionmakers support a finding that the Springdale School can provide a "free appropriate public education" consistent with the Act.

*Id*. The Lewises argue that the Clarksville School District knew about this decision and therefore conspired to change Doe's placement to ASD, rather than provide him special education services or supports required by the IDEA. Document #79 at 63-64.

But there is no evidence in the expansive record to show that the school district orchestrated a plot with the police department, the deputy prosecuting attorney, and the juvenile judge to remove Doe from the Clarksville School District in order to avoid providing him a FAPE. The events precipitating Doe's placement at ASD do not involve any unilateral action by the school district to develop or amend Doe's IEP to require placement at ASD. Rather, the events that precipitated Doe's transfer to ASD involved a variety of players, including Doe and those trying to obtain help for him. First, Doe stole a teacher's wedding ring on March 17, 2009. Ex. Vol. VI CSD at K-2. On the next day, a police officer with the Clarksville Police Department, who also served as the school resource officer, filed a report to document the incident in which he requested that a FINS petition be opened on Doe. *Id*. The deputy prosecuting attorney filed a FINS petition on April 13, 2009, requesting that Doe be adjudicated a member of a family in need of services pursuant to Ark. Code Ann. § 9-27-303(18). *Id*. at K-3. The juvenile court adjudicated Doe a member of a family in need of services on May 12, 2009. *Id*. at K-5. The court ordered the Lewises to make reasonable efforts to learn sign language and to take a tour of ASD. *Id*. at K-6. But circumstances worsened when Doe brought a pocket knife to school on September 16, 2009. *Id*. at K-11. After this incident, in a FINS review order on November 24, 2009, the court ordered Doe to attend ASD and ordered the Lewises to enroll him. *Id*. at K-18.

First, while the principal did testify in the review hearing that ASD was an option the school would like to try, the court ultimately made the call for Doe to transfer schools. Hearing Transcript Vol. XV at 201. The court subpoenaed the principal to testify. There is no indication that the

principal had prior communication with anyone else involved regarding the possibility that the court would order a transfer to ASD. Ex. Vol. VI CSD at K-17. Second, the school district's special education supervisor testified at the due process hearing that she called the ADE to ask whether the juvenile court had the authority to order Doe to enroll in ASD. Hearing Transcript Vol. XXII at 134. This demonstrates that school officials acted in good faith to ensure Doe's transfer was in compliance with the law. Third, the fact that district employees repeatedly noted Doe's poor behavior and signs of neglect does not show that the CSD engaged in a "poorly concealed attempt to paint the Parents as neglectful." Document #79 at 58. Multiple teachers, aides, and nurses independently reported Doe's behavioral problems and issues with bugs in his hearing aides and inadequate sleep. Ex. Vol. V CSD at F-34; Ex. Vol. VI CSD at I-22-26, K-2, K-11, K-9, L-2-7. The record is void of evidence to corroborate the Lewises' insinuation that the CSD fabricated these issues in order to convince the court to order Doe's transfer so that it could avoid its duty to provide him a FAPE.

## CONCLUSION

The Court has reviewed the administrative record and reviewed the additional evidence submitted by the parties. The Court cannot find based on a preponderance of the evidence that Clarksville School District violated the IDEA by avoiding its duty to provide Doe a FAPE. For the foregoing reasons, the relief requested by the Lewises is DENIED. Document #1.

IT IS SO ORDERED this 20th day of April, 2016.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE